**Guadalupe L. BUENO, Individually and as Representative of the Estate of Antonio Bueno, and Adrienne Wendy Askew, Tony R. Bueno, and Maria V. Bueno, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. CIV.A.SA–97–CA1383FB.

United States District Court,
W.D. Texas,
San Antonio Division.

May 25, 1999.

Robert C. Scott, Tinsman & Houser, Inc., San Antonio, for Guadalupe L. Bueno, Individually and as Representative of the Estate of Antonio Bueno, Adrienne Wendy Askew, Tony R. Bueno, Maria V. Bueno, plaintiffs.

Matthew L. Zabel, U.S. Department of Justice, Washington, DC, for USA, defendants.

### OPINION AND JUDGMENT OF THE COURT

BIERY, District Judge.

Neither all saint nor all sinner, Major Antonio Bueno, United States Army (ret.), was trained as a warrior to follow orders, some of which in this case turned out to be erroneous. Nevertheless, possessed of a free will, he made choices which contributed to his death at age 49.

Making an economic choice to receive military medical care by virtue of his retirement benefits, Major Bueno presented himself at Wilford Hall Medical Center and Brooke Army Medical Center on numerous occasions from April 1995 to February 1996. He was seen, examined,

tested and treated by a small army of physicians and technicians, several of whom were in the formative years of their medical training.

Stretched thin, in the middle of ancient Hippocratic devotion to patients and legislative budget parameters, military medical personnel no doubt often feel themselves between the proverbial rock and a hard place.[1] In a more simple time, the exercise of the medical arts allowed for a more personal physician-patient relationship. The bedside manner was no doubt excellent but infant mortality was high, polio crippled, heart disease killed, life spans were short, and medical technology incipient. Some would say the good old days were not all that good. The challenge now is to find the reasonable balance of how to allocate limited medical scientific resources based on the well-trained judgment of capable medical artists.

Notwithstanding early warning signals of undisputed high risk factors and symptoms,[2] testing for coronary artery disease ceased with the administering of a basic stress test resulting in Major Bueno being told he was free of heart disease, could continue an active exercise regimen, should quit smoking, and should return to the hospital if heart related symptoms should reoccur. Subsequent visits lead to referral of Major Bueno to the psychiatric clinic and a diagnosis of panic disorder. As the psychiatrists were recommending Major Bueno return to the medical clinics for gastrointestinal testing, Major Bueno suffered a fatal heart attack on March 14, 1996. As the symptoms progressed on March 14, Major Bueno happened to be close to the Brooke Army Medical Center emergency room, but in spite of his son's suggestion, chose to go home, relying on his perception from the doctors that he had no heart disease. An autopsy revealed Major Bueno was indeed suffering from severe coronary artery disease. Scarring indicated he had in fact had a heart attack in the preceding months during the time he was under the care of defendant's employees.

The liability issue in this Federal Tort Claims[3] action is whether various alleged failures of the defendant's employees fell below the recognized standard of care. Secondly, was any such failure a proximate cause of Major Bueno's premature death. The Court must also make a judgment call of how much Major Bueno's choices contributed to his early demise.

In a classic battle of experts, two well-qualified physicians reasonably disagreed: for the plaintiffs, Dr. Robert M. Stark, a doctor of internal medicine and cardiology, and for the defendant, Dr. Michael Lesch,

---

1. See e.g., Jerry Harben, *Managed care means good service to beneficiaries of Army medicine,* Army Link News (Feb. 10, 1997) <http://www.dtic.mil/armylink/news/Feb1997/a1997 0210mancare.html>("past few years have been marked by reduced budgets and personnel resources for the Army Medical Department"); Debra Gordon, *Military Medicine: Doing More with Less,* THE VIRGINIAN–PILOT AND THE LEDGER–STAR, Feb. 11, 1997(according to 2nd Fleet Commander Vice Adm. Vernon E. Clark, military budget cuts require priority in military medicine to shift focus on prevention; "[t]he end of the Cold War era, with its concurrent cuts in military funding, means doing more with less. On the military medicine side of defense, Clark said, that means focusing on cost-effective preventive efforts...instead of the treatment-focused approach military medicine has traditionally taken"); Tom Philpott, *Federal Employees'* *Health Care Plan Eyed for Military Families,* COLORADO SPRINGS GAZETTE TELEGRAPH, Sept. 16, 1995(Republican Representative John L. Mica of Florida favors move to allow military families to enroll in the Federal Employees Health Benefit Program "because budget cuts, base closings and the downsizing of military medicine are relegating military families to second-class status when it comes to health care. I find this deplorable and unacceptable.").

2. "If, in fact, you have somebody who has, quote, recurrent chest pain, going down the left arm, who's a male, who's 48, who's a smoker, there's a reasonably good chance if you took—there's a reasonably good chance in that population that the disease is present." Excerpt from the Deposition of Dr. Michael Lesch.

3. 28 U.S.C. §§ 2671–2680.

also a doctor of internal medicine and cardiology.

Dr. Stark is the Clinical Assistant Professor of Medicine at Yale University School of Medicine in New Haven, Connecticut and a practicing physician in Greenwich, Connecticut. Dr. Stark obtained his bachelor of science degree from the University of Michigan, magna cum laude, in 1970 and graduated from Harvard Medical with honors in 1974. He did a two year internship-residency in internal medicine at the Hospital of the University of Pennsylvania, was a clinical associate for one year, a cardiology fellow for two years and a chief resident at the National Heart, Lung, and Blood Institute, National Institutes of Health in Bethesda, Maryland. Dr. Stark has served as a clinical instructor in medicine at the University of Pennsylvania School of Medicine, the Georgetown University School of Medicine, and Yale University School of Medicine. He has served as a clinical assistant professor in medicine at both Georgetown University School of Medicine and Yale University School of Medicine. Dr. Stark obtained certification with the American Board of Internal Medicine in 1977 and the ABIM Subspeciality Board in Cardiovascular Disease in 1979. He is a member of the American College of Physicians, American College of Cardiology, American Federation for Clinical Research, Sigma Xi Scientific Research Society of North America, and Phi Beta Kappa. He is an author and lecturer and was the president of the Connecticut Society of Internal Medicine, a group not generally thought of as being supportive of lawsuits against physicians.

Dr. Lesch is currently the Chairman of the Department of Internal Medicine at St. Lukes–Roosevelt Hospital Center in New York and a professor of medicine at Columbia University College of Physicians and Surgeons. Dr. Lesch graduated summa cum laude from Columbia University in New York City and received his medical degree in 1964 from The Johns Hopkins University School of Medicine in Baltimore, Maryland. Upon graduation, he did an internship and residency at Osler Medical Service, The John Hopkins Hospital, was a research associate at the Laboratory of General and Comparative Biochemistry, National Institute of Mental Health in Bethesda, Maryland, and a research fellow in medicine (cardiology) as well as the chief resident physician at the Peter Bent Brigham Hospital in Boston, Massachusetts. Dr. Lesch has served as an instructor in medicine and as an assistant professor of medicine at Harvard Medical School, and as an associate director and director at the S.A. Levine Cardiac Center, Peter Bent Brigham Hospital in Boston. At Northwestern University School of Medicine in Chicago, Illinois, he has served as a Magerstadt Professor of Medicine (cardiology) as well as Acting Director, Feinberg Cardiovascular Research Institute, and as a adjunct professor of medicine. Dr. Lesch has also held the position of Chairman, Department of Medicine and Associate Medical Director at the Henry Ford Hospital.

Dr. Lesch's curriculum vitae reflects numerous honors and memberships he has attained in his career beginning in 1959 with Phi Beta Kappa at Columbia College, and ending with an entry in 1999 as a Master, American College of Physicians–American Society of Internal Medicine. He has served on the Life Sciences Advisory Committee, National Aeronautics and Space Administration, the American Heart Association, Cardiovascular B Research Study Committee and was an invited lecturer to the International Symposium on Stress and Heart Disease in Winnipeg Canada. He has been a visiting professor of cardiology/medicine at Albert Einstein College of Medicine, Michigan State University School of Medicine, Wayne State University School of Medicine, Mt. Sinai Medical Center and Medical School, and the University of Cincinnati Medical School. He was board certified by the American Board of Internal Medicine in 1972 and received his Subspeciality Certification in Cardiovascular Diseases in 1974. He has authored or co-authored over 160 articles and over 100 abstracts. Dr. Lesch

has served on the Editorial Board in Cardiovascular Medicine, American Journal of Cardiology, American Heart Journal, American Journal of Cardiac Imaging, and the American Journal of Geriatric Cardiology.

Dr. Stark opined that the standard of care was not met in that Major Bueno's risk factors and symptoms compelled further, more sophisticated, cardiovascular testing notwithstanding the negative initial stress test.

Dr. Lesch testified defendant's employees met the minimum standard of care, even though it would have also been within the standard of care to do further testing.

The expert opinions are clearly sufficient to support a judgment for either plaintiffs or defendant. Dealing not in the realm of eternal truths, but rather with reasonable probabilities, the Court must resolve the conflicting evidence, review the exhibits and view the trial. Having done so, the Court finds plaintiffs have met their preponderance of the evidence burden in establishing liability and proximate cause. Because Major Bueno was well educated, made conscious life style decisions, and chose not to seek second opinions from civilian cardiologists and not to seek emergency medical help on March 14, 1996, the Court further finds defendant's burden met that he bears some responsibility for the tragic loss visited upon his adoring family. Although the Court did not exercise its prerogative under FED. R. CIV. P. 39(c), to impanel an advisory jury, six diverse members of the Court's staff heard the evidence. After reaching a decision, the Court inquired of the staff. Interestingly, there are those who would have found solely in favor of plaintiffs or solely in favor of the defendant or who agree with the Court's conclusion.

To break the tie between Dr. Stark and Dr. Lesch, the Court relies on several factors from the entire record. Importantly, the first domino to fall was the erroneous assessment by the defendant's young intern that Major Bueno was at low risk for heart disease. It appears undisputed by experts in cardiology that 49 year-old male smokers with Major Bueno's symptoms are in the high risk category. Even though his physical complaints could also be symptomatic of other maladies, the foundational error reasonably collapsed the other dominoes to result in the missed diagnosis and nontreatment of coronary artery disease.

The writings of defendant's expert, Dr. Lesch, are instructive. In Harrison's Principles of Internal Medicine, 8th Edition, Dr. Lesch wrote a chapter in 1977 which provided in part the following:

> Coronary arteriography is the only method which will provide unequivocal diagnostic information concerning the presence or absence of coronary atherosclerosis in living patients. It also permits estimation of the severity of obstructive lesions which may be present.

> Opinion is nearly unanimous that arteriography is indicated in the following specific situations.... (2) Patients with a variety of diagnostic problems in which the diagnosis of ischemic heart disease needs to be established or ruled out.

Dr. Lesch along with Dr. Richard O. Cannon, III wrote an article in 1996 entitled *The Search for a Better Exercise Test, A Self–Fulfilling Prophecy?* which stated:

> Frustrated by limitations in the diagnostic utility of the exercise ECG,[4] many cardiologists initially perform nuclear or echo-cardiographic stress testing to diagnose CAD in patients with unknown coronary anatomy or go straight to coronary angiography without prior noninvasive stress testing.

Other literature recognized by both experts as authoritative is also informative. The 13th Edition of Harrison's Principles of Internal Medicine in 1994 provides the

---

4. This is the same test administered by defendant's employees in Major Bueno's assessment.

following on ischemic heart disease, coronary arteriography:

Coronary arteriography is indicated in....(2) patients with troublesome symptoms that present diagnostic difficulties in whom there is need to confirm or rule out the diagnosis of coronary artery disease.

Examples of other possible clinical situations include: Patients with chest discomfort suggestive of angina pectoris but a negative exercise test who require a definitive diagnosis for guiding medical management.

In addition, the June 1989 issue of the Journal of the American College of Cardiology gives guidance on the level of post-test probability required to rule in or out coronary artery disease for an individual:

A frequently used threshold is 5%, but this level could and should be varied to suit the clinical situations.... For some patients, the clinician would require the probability to be <2% to 3% to rule out coronary artery disease (for example, in a 40 year old airline pilot), whereas for others 10% to 15% might be acceptable (for example, in a 70 year old cancer patient).

The record is clear that the level of post-test probability used to diagnose Major Bueno as being free of coronary artery disease was not even that recommended for a 70 year old cancer patient.

The economic damage experts, Dr. Everett G. Dillman and Dr. Carl Hubbard present a less daunting task to the Court. With the experts' calculations being approximately $710,000 and $890,000, the Court finds the economic loss to be $800,000. The Court finds the noneconomic loss as follows:

| | | |
|---|---|---|
| Mrs. Guadalupe Bueno | - | $400,000 |
| Dr. Wendy Bueno Askew | - | $300,000 |
| Mr. Tony R. Bueno | - | $300,000 |
| Mrs. Maria Bueno | - | $200,000 |

Based on the record, the Court makes the following findings and conclusions:

1. All undisputed facts.

2. On March 14, 1996, Antonio Bueno died of a massive heart attack, due to ischemic heart disease, confirmed at autopsy.

3. During the eleven months prior to his death, Antonio Bueno sought medical care on twenty-seven occasions from Brooke Army Medical Center and Wilford Hall Medical Center. During this time, Antonio Bueno had symptoms of ischemic heart disease.

4. On the following dates, Antonio Bueno described symptoms of ischemic heart disease to defendant's medical personnel and/or sought care at Brooke Army Medical Center or Wilford Hall Medical Center:

   a. April, 1995—Brooke Army Medical Center—heavy feeling on left side of chest, tightness in neck, numbness in left forearm/elbow, indigestion.

   b. April 12, 1995—Wilford Hall Medical Center—chest tightness.

   c. April 13, 1995—Wilford Hall Medical Center—increased palpitation.

   d. April 15, 1995—Brooke Army Medical Center—left arm numbness, chest tightness, neck tightness, mild indigestion.

   e. April 18, 1995—Wilford Hall Medical Center—left arm numbness, chest tightness.

   f. April 20, 1995—Wilford Hall Medical Center—chest pain.

   g. May 3, 1995—Wilford Hall Medical Center—dizziness, left arm numbness.

   h. May 4, 1995—Wilford Hall Medical Center—angina.

   i. May 12, 1995—Wilford Hall Medical Center—sharp left chest pain, sometimes radiating to left arm.

   j. May 22, 1995—Wilford Hall Medical Center—Psychology Life Skills Center.

   k. May 26, 1995—Brooke Army Medical Center—psychiatric consult service initial evaluation—no

significant anxiety and denies chronic anxiety.

l. June 6, 1995—Wilford Hall Medical Center—Psychology Life Skills Center.

m. June 13, 1995—Wilford Hall Medical Center–Psychology Life Skills Center.

n. June 19, 1995—Wilford Hall Medical Center—stress management.

o. June 20, 1995—Wilford Hall Medical Center—anxiety management.

p. June 27, 1995—Wilford Hall Medical Center—anxiety management.

q. June 29, 1995—Wilford Hall Medical Center—Wellness Clinic.

r. July 13, 1995—Brooke Army Medical Center—Psychiatric Consult Service—cheerful, mildly worried about health.

s. July 25, 1995—Wilford Hall Medical Center—Wellness Clinic—elevated cardiac enzyme test.

t. September 14, 1995—Brooke Army Medical Center—cheerful, relaxed.

u. October 16, 1995—Brooke Army Medical Center—pinching or grabbing sensation on left triceps region.

v. November 13, 1995—Brooke Army Medical Center—anxiety gone, left arm discomfort, periodic neck pain.

w. December 13, 1995—Wilford Hall Medical Center—elevated cardiac enzyme test.

x. February 6, 1996—Wilford Hall Medical Center—tightness around neck, upper extremity paresthesia, ± chest pain, G.I. symptoms as well, negative cardiac workup [April 1995] at Wilford Hall Medical Center.

y. February 23, 1996—Wilford Hall Medical Center—mild reflux.

5. Defendant's medical personnel breached the standard of ordinary care in failing to diagnose Antonio Bueno's ischemic heart disease. In particular, they:

a. Failed to perform adequate assessment of risk factors and diagnostic testing, including an echocardiogram, thallium stress test, and cardiac catheterization.

b. Failed to refer Antonio Bueno to a qualified cardiologist.

c. Failed to admit Antonio Bueno to the hospital for testing and observation.

d. Failed to timely order and follow up on cardiac enzyme tests.

6. Defendant's medical personnel at Brooke Army Medical Center and Wilford Hall Medical Center breached the standard of ordinary care in failing to treat Antonio Bueno's heart disease.

7. If Antonio Bueno's ischemic heart disease had been properly and timely diagnosed, it could have been successfully treated.

8. The negligence of defendant, by and through its employees, the medical personnel at Brooke Army Medical Center and Wilford Hall Medical Center in failing to properly diagnose and treat Antonio Bueno, was a proximate cause of the death of Antonio Bueno.

9. Antonio Bueno's negligence proximately contributed to his death. The Court finds his percentage of negligence to be forty-five percent (45%).

10. Plaintiffs suffered damages as a result of the death of Antonio Bueno in the amounts set forth in this opinion.

11. Pursuant to the Texas Wrongful Death Statute, TEX. CIV. PRAC. & REM. CODE ANN. § 71.001 et seq. and the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680, defendant is liable to plaintiffs for eco-

nomic and noneconomic damages in the amount of $1.1 million.

IT IS THEREFORE ORDERED that plaintiffs have judgment against defendant in the amount of $1,100,000 plus costs of court to be determined based upon plaintiffs' proper submission.